# 23-410-cv(L)

## 23-418-cv(CON), 23-420-cv(CON), 23-423-cv(CON)

IN THE

# United States Court Of Appeals

### FOR THE SECOND CIRCUIT

## IN RE BYSTOLIC ANTITRUST LITIGATION

*(Caption continued on inside cover)*

*On Appeal from the United States District Court
for the Southern District of New York*

## BRIEF FOR PLAINTIFFS-APPELLANTS

Bruce E. Gerstein
Kimberly M. Hennings
GARWIN GERSTEIN & FISHER LLP
88 Pine Street, 10th Fl.
New York, New York 10005
212-398-0055

*Interim Co-Lead Counsel for
    Plaintiffs-Appellants the Direct
    Purchaser Class and Counsel for
    Plaintiff-Appellant Smith Drug
    Company*

Barry L. Refsin
Alexander J. Egerváry
Caitlin V. McHugh
HANGLEY ARONCHICK SEGAL PUDLIN
    & SCHILLER
One Logan Square, 27th Fl.
Philadelphia, Pennsylvania 19103
215-568-6200

*Counsel for Plaintiffs-Appellants CVS
    Pharmacy, Inc., Rite Aid
    Corporation, and Rite Aid Hdqtrs.
    Corp.*

*(Counsel continued on inside cover)*

CVS PHARMACY, INC., RITE AID CORPORATION, RITE AID HDQTRS. CORP., J M SMITH CORPORATION, ON BEHALF OF ITSELF AND ALL OTHERS SIMILARLY SITUATED, D/B/A SMITH DRUG COMPANY, KPH HEALTHCARE SERVICES, INC., INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, A/K/A KINNEY DRUGS, INC., MAYOR AND CITY COUNCIL OF BALTIMORE, UFCW LOCAL 1500 WELFARE FUND, TEAMSTERS WESTERN REGION & LOCAL 177 HEALTH CARE PLAN, FRATERNAL ORDER OF POLICE MIAMI LODGE 20, INSURANCE TRUST FUND, LAW ENFORCEMENT HEALTH BENEFITS, INC., TEAMSTERS LOCAL NO. 1150 PRESCRIPTION DRUG BENEFIT PLAN, TEAMSTERS LOCAL 237 WELFARE FUND AND TEAMSTERS LOCAL 237 RETIREES BENEFIT FUND, ALBERTSONS COMPANIES, INC., H-E-B L.P., THE KROGER CO., AND WALGREEN CO.,

*Plaintiffs-Appellants*,

v.

FOREST LABORATORIES, INC., FOREST LABORATORIES IRELAND, LTD, FOREST LABORATORIES HOLDINGS LTD., FOREST LABORATORIES, LLC, ALLERGAN SALES LLC, ALLERGAN, INC., ALLERGAN USA, INC., ABBVIE, INC., WATSON PHARMA, INC., WATSON LABORATORIES, INC. (NY), WATSON LABORATORIES, INC. (CT), WATSON PHARMACEUTICALS INC., ACTAVIS, INC., TEVA PHARMACEUTICALS USA, INC., TORRENT PHARMACEUTICALS LTD., TORRENT PHARMA INC., AMERIGEN PHARMACEUTICALS LTD., AMERIGEN PHARMACEUTICALS INC., GLENMARK GENERICS, INC., USA, GLENMARK GENERICS LTD., GLENMARK PHARMACEUTICALS S.A., HETERO LABS LTD, HETERO DRUGS LTD., HETERO USA INC., INDCHEMIE HEALTH SPECIALTIES PRIVATE LTD., ALKEM LABORATORIES LTD., ASCEND LABORATORIES, LLC, ANI PHARMACEUTICALS, INC., WATSON LABORATORIES, INC. (NV), WATSON LABORATORIES, INC. (DE), TEVA PHARMACEUTICAL INDUSTRIES LTD., AND GLENMARK PHARMACEUTICALS LTD.,

*Defendants-Appellees.*

David F. Sorensen
Caitlin G. Coslett
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
215-873-3000

*Interim Co-Lead Counsel for Plaintiffs-
Appellants the Direct Purchaser Class
and Counsel for Plaintiff-Appellant Smith
Drug Company*

Eric L. Bloom
HANGLEY ARONCHICK SEGAL PUDLIN &
SCHILLER
2805 Old Post Road, Suite 100
Harrisburg, Pennsylvania 17110
717-364-1030

*Counsel for Plaintiffs-Appellants CVS
Pharmacy, Inc., Rite Aid Corporation,
and Rite Aid Hdqtrs. Corp.*

Sharon K. Robertson
COHEN MILSTEIN SELLERS & TOLL
PLLC
88 Pine Street, 14th Fl.
New York, New York 10005
212-838-7797

Robin A. van der Meulen
Matthew Perez
DICELLO LEVITT LLP
485 Lexington Avenue, Suite 1001
New York, New York 10017
646-933-1000

*Interim Co-Lead Counsel for the
Proposed End-Payor Class and
Counsel for Plaintiffs-Appellants
Mayor and City Council of Baltimore;
UFCW Local 1500 Welfare Fund;
Teamsters Western Region & Local
177 Health Care Plan; Fraternal
Order of Police, Miami Lodge 20,
Insurance Trust Fund; Law
Enforcement Health Benefits, Inc.;
Teamsters Local No. 1150
Prescription Drug Benefit Plan; and
Teamsters Local 237 Welfare Fund
and Teamsters Local 237 Retirees'
Benefit Fund*

Scott E. Perwin
Lauren C. Ravkind
Anna T. Neill
KENNY NACHWALTER, P.A.
Four Seasons Tower
1441 Brickell Ave, Suite 1100
Miami, Florida 33131
305-373-1000

*Counsel for Plaintiffs-Appellants
Walgreen Co., The Kroger Co.,
Albertsons Companies, Inc. and
H-E-B, L.P.*

Michael L. Roberts
ROBERTS LAW FIRM US, PC
20 Rahling Circle
Little Rock, Arkansas 72223
501-821-5575

Dianne M. Nast
NASTLAW LLC
1101 Market Street, Suite 2801
Philadelphia, Pennsylvania 19107
215-923-9300

*Additional Counsel for Plaintiffs-
Appellants the Direct Purchaser Class
and Counsel for Plaintiff-Appellant
KPH Healthcare Services, Inc.
a/k/a Kinney Drugs, Inc.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, counsel for Plaintiffs-Appellants certify that:

CVS Pharmacy, Inc. is a wholly-owned subsidiary of CVS Health Corporation. CVS Health Corporation has no parent corporation and no publicly held corporation owns 10% or more of CVS Health Corporation's stock.

Rite Aid Corporation is a publicly held corporation, and Rite Aid Hdqtrs. Corp. is a wholly-owned subsidiary of Rite Aid Corporation. No publicly held corporation owns 10% or more of Rite Aid Corporation's stock.

Walgreen Co. is a wholly-owned subsidiary of Walgreen Boots Alliance, Inc. Walgreen Boots Alliance has no parent corporation and no publicly held corporation owns 10% or more of Walgreen Boots Alliance's stock.

The Kroger Co. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Albertsons Companies, Inc. has no parent corporation. Cerberus Capital Management L.P. may own more than 10% of its stock.

H-E-B, L.P. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

J.M. Smith Corporation d/b/a Smith Drug Company has no parent corporation and no publicly held corporation owns 10% or more of its stock.

KPH Healthcare Services, Inc. a/k/a Kinney Drugs, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

The following parties have no parent corporations and no publicly held corporation owns 10% or more of their stock:

    a.  Mayor and City Council of Baltimore;

    b.  UFCW Local 1500 Welfare Fund;

    c.  Teamsters Western Region & Local 177 Health Care Plan;

    d.  Fraternal Order of Police, Miami Lodge 20, Insurance Trust Fund;

    e.  Law Enforcement Health Benefits, Inc.;

    f.  Teamsters Local No. 1150 Prescription Drug Benefit Plan; and

    g.  Teamsters Local 237 Welfare Fund and Teamsters Local 237 Retirees' Benefit Fund.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .........................................i

TABLE OF CONTENTS...................................................... iii

TABLE OF AUTHORITIES .................................................v

PRELIMINARY STATEMENT ...............................................1

STATEMENT OF JURISDICTION............................................2

STATEMENT OF ISSUES PRESENTED...................................3

STATEMENT OF THE CASE................................................3

    I.    Nature of Case and Procedural History....................................3

    II.   The Parties ...............................................................5

    III.  Bystolic................................................................6

    IV.  General Allegations.....................................................8

        A.    Forest's Payments to Induce Settlement .....................8

        B.    Patent Merits ...............................................9

        C.    Infrequency of Brand-Generic Business Deals..........10

        D.    Forest's Historical Use of Side Deals .....................11

        E.    Defendants' Economic Motivations ........................11

    V.   Specific Allegations ...................................................12

        A.    Hetero.....................................................12

        B.    Torrent....................................................14

        C.    Alkem.....................................................15

        D.    Glenmark..................................................17

        E.    Amerigen..................................................18

F.     Watson ...................................................................19

SUMMARY OF ARGUMENT ...............................................21

STANDARD OF REVIEW ....................................................26

ARGUMENT ......................................................................26

    I.    ON A MOTION TO DISMISS, A COURT MUST DRAW ALL INFERENCES IN PLAINTIFFS' FAVOR AND NOT ASSESS WHETHER OTHER INFERENCES ARE MORE PLAUSIBLE. ...........................................................26

    II.    REVERSE PAYMENT CLAIMS DO NOT REQUIRE DETAILED ALLEGATIONS TO EXCLUDE JUSTIFICATIONS THAT DEFENDANTS MIGHT OFFER AT TRIAL. ...............................................................28

    III.    PLAINTIFFS STATED A PLAUSIBLE CLAIM BY ALLEGING THAT FOREST PAID ITS SIX GENERIC COMPETITORS TO INDUCE THEM TO DELAY GENERIC ENTRY. ..................................................................37

    IV.    THE DISTRICT COURT IMPROPERLY WEIGHED THE INFERENCES FROM PLAINTIFFS' ALLEGATIONS. ..................42

        A.    Hetero ......................................................43

        B.    Torrent .....................................................46

        C.    Alkem .......................................................49

        D.    Glenmark ..................................................51

        E.    Amerigen ..................................................53

        F.    Watson .....................................................55

CONCLUSION ...................................................................59

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162 (2d Cir. 2012) .................................................................................... passim

*Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) ..................... 28, 51, 58

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................... 27, 28

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................... passim

*Cont'l Ore Co. v. Union Carbide Corp.*, 370 U.S. 690 (1962) ...............................38

*Davitashvili v. Grubhub Inc.*, 2022 WL 958051 (S.D.N.Y. Mar. 30, 2022) .................................................................................31

*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009) ...................................27

*FTC v. AbbVie, Inc.*, 976 F.3d 327 (3d Cir. 2020), *cert. denied*, 141 S. Ct. 2838 (2021) ...........................................................................35

*FTC v. Actavis, Inc.*, 570 U.S. 136 (2013) ........................................... passim

*In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224 (D. Conn. 2015) ....................36

*In re Cipro Cases I & II*, 348 P.3d 845 (Cal. 2015) ...............................................36

*In re Keurig Green Mt. Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187 (S.D.N.Y. 2019) ...............................................................31

*In re Lipitor Antitrust Litig.*, 868 F.3d 231 (3d Cir. 2017) .................. 33, 34, 35, 47

*In re Loestrin 24 Fe Antitrust Litig.*, 261 F. Supp. 3d 307 (D.R.I. 2017) .................................................................................39

*In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152 (S.D.N.Y. 2018) .................................................................................11

*In re Nexium (Esomeprazole) Antitrust Litig.*, 42 F. Supp. 3d 231 (D. Mass. 2014), *aff'd*, 842 F.3d 34 (1st Cir. 2016) .......................................45

*In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735 (E.D. Pa. 2014) .......................36

v

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2015 WL
5458570 (D. Mass. Sept. 16, 2015) ...................................................36

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, 88 F. Supp. 3d 402
(E.D. Pa. 2015) ("*Provigil*") .................................................. 39, 45, 47

*King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.*, 791
F.3d 388 (3d Cir. 2015) ("*Lamictal*") ................................ 32, 33, 39, 47

*Kittay v. Kornstein*, 230 F.3d 531 (2d Cir. 2000) ...................................27

*Knopf v. Esposito*, 803 F. App'x 448 (2d Cir. 2020) (summary order)..................27

*Lynch v. City of New York*, 952 F.3d 67 (2d Cir. 2020) ..........................41

*NAACP v. Merrill*, 939 F.3d 470 (2d Cir. 2019) .....................................28

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ...................................31

*Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d
198 (2d Cir. 2014) .........................................................................26

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712
F.3d 705 (2d Cir. 2013) ................................................................28

*Phillips v. Cty. of Allegheny*, 515 F.3d 224 (3d Cir. 2008) ....................27

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*,
2016 WL 4992690 (S.D.N.Y. Sept. 13, 2016) ....................................35

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ......................... 27, 31

*United Food & Com. Workers Local 1776 & Participating Emps.
Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp.
3d 1052 (N.D. Cal. 2014) ..............................................................36

*United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015).......................29

## Statutes

15 U.S.C. § 15 ................................................................................2

15 U.S.C. § 26 ................................................................................2

28 U.S.C. § 1291 ........................................................................................3

28 U.S.C. § 1331 ........................................................................................2

28 U.S.C. § 1332 ........................................................................................2

28 U.S.C. § 1337 ........................................................................................2

## PRELIMINARY STATEMENT

In *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013), the Supreme Court held that reverse payments by brand pharmaceutical manufacturers to generic manufacturers to settle Hatch-Waxman patent litigation must be analyzed under the antitrust rule of reason. The Supreme Court specifically held that, to state a claim, the FTC did not have to make detailed allegations in its complaint ruling out the possibility of any procompetitive justifications for the reverse payment. It explicitly put the burden on the antitrust *defendant* to "show in the antitrust proceeding that legitimate justifications are present, thereby explaining the presence of the [payment] and showing the lawfulness of that term under the rule of reason." *Actavis*, 570 U.S. at 156.

Here, Plaintiffs allege that Forest Laboratories, Inc. ("Forest") and six generic manufacturer defendants (the "Generic Defendants") violated the antitrust laws when Forest made a reverse payment to each Generic Defendant to delay the launch of competing generic versions of Bystolic, Forest's billion-dollar-per-year brand drug. Plaintiffs alleged that Forest entered into side deals with each Generic Defendant that Forest admitted were worth at least $15 million each and that those payments exceeded the litigation costs that Forest saved by settling. Although not required to do so by *Actavis* or any other precedent, Plaintiffs pled in detail that none of the payments was justified by Forest's need for any product or service.

In dismissing Plaintiffs' complaints, the district court demanded more than can possibly be expected of plaintiffs pre-discovery. It required Plaintiffs without discovery to exclude *any* procompetitive justifications it or Defendants could imagine. Because the district court was able to draw "plausible" inferences that Defendants might be able to justify Forest's payments based on Plaintiffs' allegations, it held that Plaintiffs had not adequately stated a claim under *Actavis*. The district court refused to construe the allegations in Plaintiffs' favor ***more than a dozen times***, finding Defendants' unsubstantiated assertions to be "entirely plausible," "more plausible," "equally as plausible," "equally explicable," or just as "consistent" as the inferences Plaintiffs sought to draw. Under controlling law in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d 162 (2d Cir. 2012), the district court's assessment of the plausibility of Plaintiffs' allegations on a motion to dismiss was erroneous.

## STATEMENT OF JURISDICTION

This appeal arises from the district court's orders of January 24, 2022, and February 21, 2023, the latter of which dismissed Plaintiffs' claims with prejudice. The district court had jurisdiction under 15 U.S.C. §§ 15(a), 26 and 28 U.S.C. §§ 1331, 1332 (d), 1337. Plaintiffs filed timely notices of appeal. JA-2066, JA-

2068, JA-2071, JA-2072. This Court has jurisdiction over these appeals under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED

1. Did Plaintiffs' allegations that Forest made large and unjustified reverse payments to six generic competitors in exchange for their agreements not to launch generic Bystolic until September 17, 2021, adequately state a claim under *Actavis*, where Plaintiffs alleged that each payment was made in connection with a settlement of patent litigation, each payment exceeded the litigation expenses that Forest saved by settling the patent litigation, and Forest did not otherwise need any of the side deals by which it made the payments to its six generic competitors?

2. In dismissing Plaintiffs' reverse payment claims, did the district court improperly construe Plaintiffs' allegations in Defendants' favor by requiring the inferences drawn from their factual allegations to be more plausible than alternative inferences offered by Defendants in contravention of *Twombly* and *Anderson News*?

## STATEMENT OF THE CASE

### I. Nature of Case and Procedural History

Plaintiffs alleged violations of Sections 1 and 2 of the Sherman Act arising out of Forest's reverse payments to each Generic Defendant to delay generic

3

Bystolic. JA-1475-85.[1] Plaintiffs filed their initial complaints in 2020. JA-0031, JA-0120, JA-0131, JA-0143-44. On November 9, 2020, Defendants produced some of the agreements referred to in Plaintiffs' initial complaints, which were not previously available to Plaintiffs. JA-0041; CMO No. 1, S.D.N.Y. Dkt. No. 20-cv-5735, ECF No. 82. On December 3 and 23, 2020, Plaintiffs filed their first amended complaints incorporating additional detail from the agreements that Defendants produced. JA-0046-47, JA-0134, JA-0145-46. On February 8, 2021, Defendants moved to dismiss all of Plaintiffs' claims. JA-0058-59.

In response, on March 15, 2021, Plaintiffs amended their complaints. JA-0064-65, JA-0135-37, JA-0147. On April 23, 2021, Defendants renewed their motions to dismiss. JA-0068-70. On January 24, 2022, the Honorable Lewis J. Liman held that Plaintiffs adequately pled that Forest made large payments to each of the first five generic manufacturers, but that they failed to adequately allege that the payments were "unjustified" or that the payment to Watson, the last settling generic manufacturer, was "large." SA-0036-57. Judge Liman dismissed Plaintiffs' complaints with leave to amend. SA-0065.

On February 22, 2022, Plaintiffs again amended their complaints. JA-0088-90, JA-0138, JA-0149. On April 19, 2022, Defendants renewed their motions to

---

[1] End-Payor Plaintiffs pled violations of state antitrust and consumer protection laws arising out of the same conduct. JA-1710-75.

dismiss.  JA-0093-94.  On February 21, 2023, Judge Liman entered an order and opinion dismissing Plaintiffs' claims with prejudice.  SA-0119.

On March 20, 2023, Plaintiffs filed notices of appeal.  JA-0107-08.

## II.    The Parties

Plaintiffs are: (1) a proposed class of direct purchasers of brand and generic Bystolic (JA-1501); (2) six retail chains who bring individual lawsuits as assignees of direct purchasers of brand and generic Bystolic (JA-1372, JA-1258-60); and (3) a proposed class of end payors who pay for brand and generic Bystolic (JA-1702-03).[2]  Defendants are Forest,[3] the manufacturer of brand Bystolic, and the

---

[2] Because all Plaintiffs' complaints are substantially the same, this brief hereafter cites the Direct Purchaser Plaintiffs' Second Amended Complaint (JA-0336-432) or Third Amended Complaint (JA-1471-584).

[3] Forest includes Forest's successors AbbVie Inc., Allergan, Inc., Allergan Sales, LLC, and Allergan USA, Inc., as well as its affiliates Forest Laboratories, Inc., Forest Laboratories Holdings, Ltd., Forest Laboratories LLC, and Forest Laboratories Ireland Ltd.  JA-1485-89.

Generic Defendants who sought to sell lower priced generic Bystolic: Hetero,[4]

Torrent,[5] Alkem,[6] Glenmark,[7] Amerigen,[8] and Watson.[9]

All Plaintiffs seek damages arising from Forest's payments to delay generic

Bystolic.

### III. Bystolic

Bystolic is a brand-name prescription drug containing nebivolol

hydrochloride ("nebivolol") prescribed to treat high blood pressure.  JA-1475-76.

Bystolic was one of Forest's most profitable products, generating nearly $1 billion

in annual sales.  JA-1476.  Generics are typically sold at a price discount of 50-

80% (or more) compared to their brand counterparts, and usually take 80% (or

more) of brand sales within six months of generic entry.  *Id.*

---

[4] Hetero USA Inc., Hetero Labs Ltd. and Hetero Drugs Ltd.  JA-1497-98.

[5] Torrent Pharmaceuticals Ltd. and Torrent Pharma Inc.  JA-1496.

[6] Alkem Laboratories Ltd., Ascend Laboratories, LLC, and Indchemie Health Specialties Private Ltd.  JA-1498-99.

[7] Glenmark Generics Inc., USA, Glenmark Generics Ltd., Glenmark Pharmaceuticals Ltd., and Glenmark Pharmaceuticals S.A.  JA-1497.

[8] Amerigen Pharmaceuticals, Inc., Amerigen Pharmaceuticals, Ltd., and ANI Pharmaceuticals, Inc.  JA-1496.

[9] Watson Pharmaceuticals, Inc., Watson Laboratories, Inc. (NV), Watson Laboratories, Inc. (DE) n/k/a Actavis Laboratories UT, Inc., Watson Laboratories, Inc. (NY), Watson Laboratories, Inc. (CT), Watson Pharma, Inc. n/k/a Actavis Pharma, Inc., Actavis, Inc., Teva Pharmaceutical Industries, Ltd. and Teva Pharmaceuticals USA, Inc.  JA-1489-91.

Forest listed U.S. Patent Nos. 6,545,040 (the "'040 Patent") and 5,759,580 (the "'580 Patent") in the FDA's Orange Book as covering Bystolic. JA-1477, JA-1514. The '580 Patent expired on June 2, 2015. JA-1514. The '040 Patent expired on December 17, 2021. JA-1514. Under the Hatch-Waxman Act – the regulatory scheme governing the approval of generic drugs – each Generic Defendant filed an Abbreviated New Drug Application ("ANDA") that included a Paragraph IV certification as to the '040 Patent, and some or all made such a certification as to the '580 Patent. JA-1514, JA-1519.

In a Paragraph IV certification, a generic manufacturer certifies that an Orange-Book-listed patent is invalid or would not be infringed by its proposed generic product. JA-1505. The first Paragraph IV ANDA filer is entitled to a 180-day exclusivity period during which the FDA will not approve any other ANDA generic. JA-1506-07. Here, because each Generic Defendant filed ANDAs with Paragraph IV certifications on the same day, all were considered first filers eligible to share that 180-day exclusivity. JA-1507. The 180-day period would start running for all six Generic Defendants if any one of them launched, even if others did not launch. *Id.*

Brand manufacturers may file patent infringement suits against generic manufacturers that file Paragraph IV certifications. JA-1505-06. If the brand timely sues, FDA approval of the generic's ANDA is automatically stayed for up

to 30 months.  *Id*.  Here, Forest timely filed suit against each Generic Defendant on the '040 Patent.  JA-1520-22.

## IV.  General Allegations

Plaintiffs made general allegations applicable to all of the side deals to show that they represented large payments made to delay generic Bystolic.

### A.    Forest's Payments to Induce Settlement

Forest settled with all of the Generic Defendants between October 24, 2012, and November 2013.  JA-1476-77.  Each Generic Defendant agreed not to sell generic Bystolic for more than seven years, until September 17, 2021, just three months before the '040 Patent's expiration (unless another Generic Defendant entered the market earlier).  *Id.*  Forest also entered "side-deals" with each Generic Defendant as a *quid pro quo* for delaying generic entry until September 17, 2021. *Id.*  To prepare for a meeting with the FTC, Forest's outside counsel emailed Forest's in-house counsel asking him to identify any "side deals" made in connection with its Bystolic settlements.  JA-1524-25.  Forest's in-house counsel responded that the settlements with the Generic Defendants "[a]ll had side deals." JA-1525.

Additionally, Forest's Merger Agreement with Actavis PLC identified each side deal as a "material contract[]," described as a contract "involving the settlement of any action" and that, *inter alia*, "involve[d] payments . . . of

consideration in excess of $15,000,000." JA-1479-80, JA-1525. These payments were "in connection with the settlement of BYSTOLIC patent dispute," and were in addition to payments for Forest's saved legal fees and each Generic Defendant's "legal costs." JA-1479-82. Plaintiffs further alleged that Forest saved far less than $6 million in legal expenses from each settlement. JA-1549-50.

After Plaintiffs filed their initial complaints, Forest produced the settlement agreements and certain of the side deals. Plaintiffs thereafter amended their complaints to plead in greater detail the large payments that induced each Generic Defendant to delay generic Bystolic until September 17, 2021. JA-0390-99. The agreements revealed payments ranging from at least $15 million to $37.5 million. *Id.*

## B. Patent Merits

Plaintiffs alleged that Forest's '040 Patent was weak and that Forest could not prevail in the patent litigation. JA-1522-24. The '040 patent had a narrow scope that did not cover the generic Bystolic products of any Generic Defendant and faced significant validity challenges. *Id.* Nebivolol possesses four so-called "chiral centers" – carbon atoms bonded to four different atoms or groups of atoms. JA-1512-14. Each of the four chiral centers can adopt one of two configurations referred to as either an "R" or an "S" configuration. JA-1513-14. Thus, nebivolol can have ten different configurations, each of which was disclosed in an earlier

patent. *Id.* The active ingredient in Bystolic consists of two of the ten configurations: SRRR and RSSS. JA-1514.

During the '040 Patent's prosecution, the applicants limited their claims to a mixture consisting only of the SRRR and RSSS forms of nebivolol. JA-1515-16, JA-1518. The Generic Defendants were each aware of the '040 Patent's prosecution history. JA-1523. Because each Generic Defendant's product included some of the unclaimed forms of nebivolol, they did not infringe the '040 Patent. *Id.* Their products also contained other pharmaceutical carriers that also would have made them non-infringing. *Id.* As a result, Forest could not prove that the Generic Defendants infringed either literally or under the doctrine of equivalents. *Id.* The Generic Defendants also had a potent invalidity defense based on anticipation and/or obviousness. JA-1523-24. Had the '040 Patent been litigated, the Generic Defendants would have prevailed. JA-1478, JA-1551.

## C. Infrequency of Brand-Generic Business Deals

Plaintiffs alleged that, outside of patent settlements, brand and generic pharmaceutical manufacturers rarely enter into the kind of side deals that Forest struck with the Generic Defendants. A study of 143 Hatch-Waxman settlements described how the use of "side deals" to disguise reverse payments became common because of increased antitrust scrutiny of naked cash reverse payments. JA-1526. In such settlement side deals, brand companies commonly agree to pay

the generic company for a product or service, such as for patent licenses, raw material supply, manufacturing services, or product development or co-promotion services. *Id*. Such side deals are unusual outside the patent settlement context because brand and generic pharmaceutical companies are competitors, and, in the context of Hatch-Waxman patent settlements, litigation adversaries. JA-1526-27. Nevertheless, Forest reached side deals with all Generic Defendants trying to introduce generic Bystolic.

### D. Forest's Historical Use of Side Deals

Plaintiffs further pled that Forest historically used side deals as a method of concealing reverse payments. In 2010, just a few years before the side deals at issue in this case, Forest executed a side deal concerning another blockbuster product (Namenda), which Forest "explicitly present[ed] [with the] Namenda patent settlement as a package." JA-1528 (quoting *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 199 (S.D.N.Y. 2018)).

### E. Defendants' Economic Motivations

Plaintiffs alleged that the economic motivations of Forest and the Generic Defendants impacted the payment that Forest made to induce settlement and avoid the risk of competition. Because the Generic Defendants shared first-to-file exclusivity, each stood to make relatively little from selling generic Bystolic because fierce generic price competition would commence if all six introduced

generic Bystolic on or about the same day.  JA-1520.  Accordingly, Forest did not have to pay each as much to induce it to delay as it would have to pay a single first filer.  *Id*.  Yet Forest needed to induce each to abandon the patent litigation because if even one refused to delay, all could launch.  None was willing to forfeit its 180-day exclusivity, however, and each insisted on so-called "contingent launch" provisions that accelerated each generic's launch date to the date that any other generic launched.  *Id*.

## V.    Specific Allegations

In addition to Plaintiffs' general allegations, Plaintiffs made specific allegations as to each side deal to support the inference that its purpose was to pay the Generic Defendants to delay generic Bystolic.

### A.    Hetero

Forest's October 24, 2012, settlement agreement with Hetero included $200,000 purportedly for Forest's saved legal fees and Hetero's expended litigation fees and costs.  JA-0390.  On October 5, 2012, just weeks before the settlement, Forest and Hetero executed a Final Term Sheet for an active pharmaceutical ingredient ("API") supply agreement.  *Id*.  The Term Sheet required Forest to purchase at least 50% of its requirements of nebivolol API from Hetero for at least five years.  *Id*.  Based on Forest's estimated annual requirements of nebivolol, Forest agreed to pay Hetero $37.5 million (before any price

adjustments). *Id.* Plaintiffs alleged that Forest already had a sufficient supply of nebivolol API from Janssen Pharmaceutical NV ("Janssen"), and therefore Forest did not need Hetero to supply nebivolol. *Id.* Forest had to amend its preexisting supply agreement with Janssen to meet the agreed requirements in the Hetero supply agreement. *Id.*

In response to the district court's first dismissal order, Plaintiffs added more detail to support their allegation that Forest had no need for nebivolol from Hetero, including:

(1) Just seven months before the Hetero Final Term Sheet, Forest entered into an all-requirements contract with Janssen, rendering it unlikely that Forest had a legitimate need for additional API.

(2) Absent the need to compensate Hetero for delaying generic entry, it is unlikely that Forest would have shifted 50% of its requirements away from Janssen, which originally developed nebivolol in the 1990s and had a long-standing business relationship with Forest.

(3) Publicly available information reveals no evidence that Forest was experiencing API supply issues, needed a backup supplier for nebivolol API, or was engaged in a bid selection process for a backup supplier.

(4) The Hetero Final Term Sheet does not state that Forest was experiencing API supply issues, needed a backup supplier for nebivolol API, or that Janssen had breached its agreement with Forest or was not performing to Forest's satisfaction.

(5) The Hetero Final Term Sheet does not identify any cost savings for Forest, and publicly available information does not reveal the price that Forest was paying Janssen.

(6) While API supply agreements are typically long and detailed, as demonstrated by the 80-page Forest/Janssen agreement, the Hetero Final Term Sheet is less than 8 pages long and looks like a "rush job." It does

not contain typical terms and conditions, was never converted into a full-length agreement, and was executed before Janssen's necessary consent was obtained.

JA-1529-31.

## B. Torrent

Forest's November 21, 2012 settlement agreement with Torrent included a payment of up to $1 million purportedly for Forest's saved legal fees and Torrent's expended litigation fees and costs. JA-0391. On the same day, Forest and Torrent executed a Patent Assignment Agreement whereby Forest agreed to purchase ten patents purportedly covering compositions and/or manufacturing processes used to manufacture nebivolol. *Id*. Forest agreed to pay Torrent $17 million in upfront and milestone payments combined. *Id*. The milestones were easily earned. Forest had to pay $7 million if any one of the ten assigned patent applications issued as a patent in the United States. JA-0391. Plaintiffs alleged that Forest did not need any of these patents since Forest had long manufactured and marketed nebivolol in the United States and elsewhere without such patents or any licenses. JA-0392.

In response to the district court's first dismissal order, Plaintiffs amended to add more detail to support their allegation that Forest had no need for the Torrent patents including:

(1) It was unlikely that any of the Torrent patents could block the sale of Bystolic, since the '580 compound patent for nebivolol plus the actual commercial sales of Bystolic likely would have been invalidating prior art against any newly issued Torrent patent that sought to cover Bystolic.

(2) Just months before entering into the Patent Assignment Agreement, Forest purchased what it termed as "all" U.S. patents and intellectual property for Bystolic from Janssen for $357 million. Had Forest believed that other patents existed that would block its sale of Bystolic, it is unlikely that it would have paid so much to Janssen.

(3) Forest made no public statements indicating that it was planning to reformulate Bystolic using the Torrent patents, nor did it publicly place a value on the Torrent patents in its subsequent securities filings.

(4) The $7 million milestone was triggered by the U.S. issuance of any of the assigned patents, not by the issuance of any patent that might have supported a reformulation of Bystolic.

JA-1533-34; JA-1155.

## C. Alkem

Forest's November 27, 2012, settlement agreement with Alkem included a $1 million payment purportedly for Forest's saved litigation fees and costs and Alkem's expended litigation fees and costs. JA-0392-93. One day after signing the agreement, Forest and Alkem signed a "Term Sheet" under which Alkem agreed to supply Forest with finished drug product for Bystolic and Byvalson, a product in development consisting of Bystolic and valsartan. *Id.* Under the Term Sheet, Forest agreed to pay at least $20 million to Alkem. *Id.* Plaintiffs alleged that Forest did not need another supplier to manufacture Bystolic since Forest had been producing sufficient quantities of Bystolic to meet market demand. JA-0393.

In response to the district court's first dismissal order, Plaintiffs amended to add more detail to support their allegation that Forest had no need for the supply agreements, including:

15

(1) No public information indicated that Forest had any need for products or services from Alkem or had previously expressed interest in retaining Alkem to manufacture Bystolic or Byvalson.

(2) Neither publicly available information nor the Term Sheet contain evidence that Forest was experiencing supply shortages or manufacturing problems for the finished dosage form of Bystolic.

(3) When the Term Sheet was executed, Forest had not yet submitted its NDA for Byvalson, and there was no evidence that Forest needed an agreement which committed it to make payments even if the Byvalson NDA were delayed.

(4) Because the Term Sheet provides that Forest would pay Alkem $13 million in milestones for "Development Work" related to both products and provides that Forest would reimburse Alkem for the "costs and expenses incurred in connection with the Development Work," the Term Sheet obligated Forest to pay Alkem twice for the same tasks.

(5) The Term Sheet obligated Forest to supply Alkem with free API (which likely conferred significant financial benefit); and pay Alkem as much as a 10% premium over "prices generally available" from other supply sources, indicating that the terms were one-sided.

(6) The Term Sheet did not contain typical terms and conditions found in manufacturing and supply agreements, but provided that the parties "shall" enter into such a final agreement, which does not appear to have happened.

(7) The Term Sheet was a "rush job" intended to convey a reverse payment rather than obtain goods for sale. Typical industry custom is for a company to conduct due diligence before entering into a manufacturing agreement, but the Term Sheet provided for due diligence only after its execution. Moreover, Forest agreed to purchase 45% of its requirements for both products even though Alkem lacked FDA approval to manufacture finished product.

JA-1535-37; JA-1156, JA-1169.

### D.     Glenmark

Forest's December 21, 2012, settlement agreement with Glenmark included a payment of up to $1.2 million purportedly for Forest's saved litigation fees and costs and Glenmark's expended litigation fees and costs.  JA-0394.  On the same day, Forest and Glenmark executed a Collaboration and Option Agreement under which Forest and Glenmark would jointly develop microsomal prostaglandin e systhase-1 ("mPGES-1") products for at least 27 months absent earlier termination. *Id.*  Under the agreement, Forest agreed to pay Glenmark $15 million in upfront and milestone payments.  *Id.*  Nevertheless, all intellectual property developed by Glenmark in connection with mPGES-1 remained the exclusive property of Glenmark except that Forest had an option for a Right of First Negotiation of a mutually acceptable exclusive license to use the mPGES-1 technology to develop and commercialize products in the U.S., Mexico, Canada, and possibly elsewhere. *Id.*

Plaintiffs alleged that before executing these agreements, Forest had expressed no interest to Glenmark concerning mPGES-1, and that the payments under the Collaboration and Option Agreement exceeded the fair value of any products delivered or services rendered by Glenmark.  JA-0394-95.

In response to the district court's first dismissal order, Plaintiffs amended to add more detail to support their allegation that Forest had no interest in mPGES-1, including:

(1) Publicly available information contained no evidence that Forest had expressed interest in Glenmark's development of mPGES-1 before executing the Collaboration and Option Agreement.

(2) The structure of the Collaboration and Option Agreement was substantially different from a previous collaboration agreement between Forest and Glenmark concerning a different Glenmark product, which, based on publicly available information, was not related to the settlement of patent litigation.

(3) The parties explicitly valued Forest's right to negotiate with Glenmark at $6 million, meaning that Forest committed to pay $9 million in development costs knowing that it might not reach a future deal for any resulting product nor obtain any other benefit.

JA-1538-40.

### E.    Amerigen

Forest's July 18, 2013, settlement agreement with Amerigen included up to a $2 million payment allegedly for Forest's saved litigation fees and costs and Amerigen's expended litigation fees and costs.  JA-0395.  On the same day, Forest and Amerigen executed a Binding Term Sheet Collaboration Agreement pursuant to which Forest agreed to invest in the development of eight Amerigen products. *Id.*  The Collaboration Agreement provided for a total of $25 million in upfront and milestone payments.  *Id.*  Plaintiffs alleged that Forest had expressed no interest in Amerigen's products before executing these agreements, and that the payments

under the Collaboration Agreement exceeded the fair value of any products delivered or services rendered by Amerigen. *Id.*

In response to the district court's first dismissal order, Plaintiffs amended to add more detail to support their allegation that Forest had no need for Amerigen's generic products including:

(1) Publicly available information contained no evidence that Forest had a pre-existing relationship with Amerigen or had ever expressed interest in Amerigen's products before entering into the Binding Term Sheet.

(2) At the time the Binding Term Sheet was signed, Forest publicly held itself out as a specialty pharmaceutical company focusing on branded drug products, but the majority of the Amerigen products were generic products outside Forest's stated focus.

(3) The Binding Term Sheet gave Amerigen the unilateral ability to discontinue any of the eight products, and if it did, to swap in two other products, indicating that Forest did not truly care about what products it was investing in.

(4) The Binding Term Sheet provided that the parties would "immediately" negotiate a definitive agreement with provisions "usual and customary" for a collaboration agreement, but Forest and Amerigen did not do so until nearly one year later, just weeks after the FTC issued a Civil Investigative Demand to Forest concerning its Bystolic settlements with the Generic Defendants, suggesting that the execution of a definitive agreement was driven by a desire to avoid antitrust liability rather than a legitimate desire to license generic products.

JA-1541-42; JA-1163.

## F. Watson

Forest's November 6, 2013, settlement agreement with Watson included a payment of up to $2 million allegedly for Forest's saved litigation fees and costs

and Watson's expended litigation fees and costs. JA-0395-96. Just before executing the Settlement Agreement, Forest and Watson entered a series of agreements related to Moksha8, Inc., a Brazilian startup drug manufacturer in which Forest and Watson both had investments. JA-0395-96. The agreements included a Letter Agreement between Forest and Moksha8, in which Forest elected to make certain loan payments to Moksha8 that it was not required to make because of Moksha8's breach of loan conditions, and a Termination and Release Agreement that terminated certain contractual relationships between Watson and Moksha8 and broadly released Watson from potential claims by Moksha8. JA-0396-97.

Plaintiffs alleged that the value of the agreements to Watson substantially exceeded the $4 million payment that Watson agreed to make to Moksha8 in the Termination and Release Agreement and the fair value of any other products delivered or services rendered by Watson in connection with those agreements. JA-0397-98. Forest's merger disclosures confirm that the value of this series of agreements exceeded $15 million. JA-0389-90.

In response to the district court's first dismissal order, Plaintiffs amended to add more detail to support their allegation that Forest made a large payment to Watson, including:

(1) The history of Forest's and Watson's investment in Moksha8 leading up to the Letter Agreement and Termination and Release Agreement.

(2) The only apparent reason for disclosure of the Letter and Termination Agreements in Forest's February 2014 merger disclosures would be if they involved payments above $15 million.

(3) Watson's considerable leverage in settlement discussions with Forest as the last of the Generic Defendants to settle, which made it unlikely that Forest would forego paying Watson and risk losing the benefit of its other payments in connection with the settlements with all other first-filing generics.

(4) Forest's abrupt termination of its obligations to provide additional funding and its right to acquire Moksha8 just two months after the Letter and Termination Agreements, undercutting any independent business justifications for the value transferred to secure Watson's release and the termination of its agreements with Moksha8.

JA-1543-49.

## SUMMARY OF ARGUMENT

In *Actavis*, the Supreme Court held that reverse payments by brand drug manufacturers to their generic competitors to delay generic competition should be evaluated under the antitrust rule of reason. Such scrutiny is required because a settlement with a reverse payment is "unusual" and "there is reason for concern that settlements taking this form tend to have significant adverse effects on competition." *Actavis*, 570 U.S. at 147-48. The Court explained that the fundamental question in evaluating a reverse payment is the reason for the reverse payment: "If the basic reason is a desire to maintain and to share patent-generated monopoly profits, then, in the absence of some other justification, the antitrust laws are likely to forbid the arrangement." *Id.* at 158.

The Court held that reverse payments give rise to such concerns when they are "large and unjustified." *Id.* These features are related. A payment may be large if it exceeds the litigation expenses that the brand avoided by settling since such a payment suggests that the brand was paying the generic manufacturer "to avoid the risk of patent invalidation or a finding of noninfringement." *Id.* at 156. Similarly, a defendant may ultimately seek to justify a reverse payment by showing that it was no more than the brand-patentee's avoided litigation expenses. *Id.*

In *Actavis* itself, the FTC alleged that a brand manufacturer paid two generic companies in exchange for a delayed generic entry date. The defendants characterized the payments as compensation for copromotion services by the generic manufacturers, but the Court did not require detailed allegations about why the value of the services did not justify the cash payments. Rather, it recognized the FTC's contentions that the services had "little value" and that the "true point of the payments was to compensate the generics" to delay their launch. *Id.* at 145. The Court specifically recognized that defendants would have the opportunity to show legitimate justifications, if any, in the antitrust proceeding. *Id.* at 156. Federal courts following *Actavis* have consistently found reverse payments to be adequately alleged where plaintiffs plead that the brand manufacturer paid a generic more than the brand's saved litigation expenses for a generic entry date.

Plaintiffs sufficiently alleged such a claim. They pled that, in exchange for each Generic Defendant's agreement to delay the launch of generic Bystolic until September 17, 2021, more than seven years after the settlements, Forest agreed to side deals worth at least $15,000,000 each. Plaintiffs pled that these side deals were admittedly related to the patent settlement agreements with each Generic Defendant and exceeded the legal fees that Forest avoided by settling. Though not required, Plaintiffs further pled that the payments could not be justified as fair value for any goods or services that Forest received from the Generic Defendants because, *inter alia*, Forest had no need for the goods and services in the side deals. Finally, Plaintiffs pled that Forest's '040 Patent would not have kept the Generic Defendants off the market until September 17, 2021 because it was a very narrow patent that was not infringed by any of the generic products and faced significant validity challenges. Accordingly, the Generic Defendants were likely to win the patent litigation had Forest not paid them off.

The district court held that Plaintiffs adequately pled that the payments to five of the six Generic Defendants were "large" but failed to plead adequately that they were "unjustified" or that the payment to Watson, the sixth generic manufacturer, was "large." In its initial opinion, the district court insisted on a pleading standard that far exceeded that of any court considering a motion to dismiss an *Actavis* claim. It interpreted *Actavis* to require Plaintiffs to "show the

absence of one or more factors that would be consistent with a pro-competitive justification." SA-0029. That is, it required Plaintiffs to rebut, at the pleading stage, that the side deals were justified, a burden that *Actavis* expressly put on Defendants.

It also improperly compartmentalized Plaintiffs' allegations. It failed to recognize that a payment's size compared to avoided litigation expenses is relevant *both* to whether the payment is large *and* whether it is unjustified. It required Plaintiffs to show that each individual reverse payment was independently large and unjustified without considering Plaintiffs' allegation that Forest needed to pay all six generic manufacturers to successfully protect its Bystolic monopoly. It discounted the characterizations of Forest's own lawyers of the connection between the settlement agreements and the side deals and adopted alternative interpretations of Forest's merger disclosures to conclude that Plaintiffs had not established any payment to Watson. And, it failed to consider Plaintiffs' allegations about the weakness of Forest's patent cases against the Generic Defendants. Although proof of the patent merits is not an element of a reverse payment claim, Plaintiffs' allegations support an inference that Forest's patent would not have kept the Generic Defendants off the market until September 17, 2021, and therefore Forest likely paid the Generic Defendants for that entry date.

The district court's final order dismissing Plaintiffs' final amended complaints went even further astray. Plaintiffs alleged additional facts with respect to the first five generic settlements that further supported an inference that Forest did not need any of the products or services in the side deals. Although they do not have all the agreements governing the Moksha8 transaction, Plaintiffs alleged that the documents they possess strongly suggest that Watson received $15 million in value from Forest because there was no other reason for Forest to have disclosed the Watson Letter and Termination Agreements in its merger disclosures. Rather than accepting these facts and drawing all inferences in Plaintiffs' favor on Defendants' motion to dismiss, the district court assessed whether Plaintiffs' inferences were *more* plausible than those offered by Defendants. The district court rejected fair inferences that Plaintiffs sought to draw ***more than a dozen times*** because it determined that Defendants' alternative inferences were "entirely plausible," "more plausible," "equally as plausible," "equally explicable," or just as "consistent with" the inferences Plaintiffs sought. *See generally* SA-0066-118.

The district court justified its assessment of Plaintiffs' allegations based on misinterpretations of *Twombly* and *Actavis*. This Court has specifically held that "the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary

judgment." *Anderson News*, 680 F.3d at 184. The pleading standard that the district court inferred from the FTC's arguments to the Supreme Court in *Actavis* directly conflicts with the Court's express holding. The Supreme Court *did not* require the FTC to plead in detail that the reverse payments were unjustified. Rather, it permitted the FTC's claims to proceed beyond a motion to dismiss based on the allegation that the services provided by the generics had "little value" and, contrary to the district court's claim, put the burden on defendants to justify any reverse payment during the litigation.

## STANDARD OF REVIEW

This Court's review of a district court's grant of a Rule 12(b)(6) motion is *de novo*. *Anderson News*, 680 F.3d at 185.

## ARGUMENT

## I. ON A MOTION TO DISMISS, A COURT MUST DRAW ALL INFERENCES IN PLAINTIFFS' FAVOR AND NOT ASSESS WHETHER OTHER INFERENCES ARE MORE PLAUSIBLE.

In assessing the sufficiency of a complaint, a court must "accept[] all of the complaint's factual allegations as true and draw[] all reasonable inferences in the plaintiffs' favor." *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014) (cleaned up). To survive a motion to dismiss, a plaintiff's claims must be plausible, but plausibility "*does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a*

*reasonable expectation* that *discovery* will reveal evidence of illegal agreement."
*Anderson News*, 680 F.3d at 184 (quoting *Twombly*, 550 U.S. at 556) (emphasis in original). To "unlock the doors of discovery," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), plaintiffs must simply "nudge[] their claims across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570.

"The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Anderson News*, 680 F.3d at 185. Put another way, "[a] court ruling on [a dismissal] motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible." *Id. See also Knopf v. Esposito*, 803 F. App'x 448, 453 (2d Cir. 2020) (summary order) ("On a motion to dismiss, district courts may not simply disregard allegations in the complaint and credit instead an alternative narrative advanced by defendants."). "[F]act-specific question[s] cannot be resolved on the pleadings." *Todd v. Exxon Corp.*, 275 F.3d 191, 203 (2d Cir. 2001).

Importantly, "standards of pleading are not the same as standards of proof." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 214 (3d Cir. 2009) (citing *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 246 (3d Cir. 2008)). *See also Kittay v. Kornstein*, 230 F.3d 531, 542 (2d Cir. 2000) ("[A] plaintiff is not required to prove his case at the pleading stage." (citation omitted)). Plausibility does not require a plaintiff "to

plead facts establishing a prima facie case." *NAACP v. Merrill*, 939 F.3d 470, 477 (2d Cir. 2019) (citation omitted).

## II. REVERSE PAYMENT CLAIMS DO NOT REQUIRE DETAILED ALLEGATIONS TO EXCLUDE JUSTIFICATIONS THAT DEFENDANTS MIGHT OFFER AT TRIAL.

Based on *Twombly* and *Actavis*'s rejection of the "quick look" rule of reason, the district court held that Plaintiffs had failed to allege adequately that five of the six alleged reverse payments were "unjustified" or that the sixth reverse payment (to Watson) was "large." SA-0082-83. But such allegations are not required by *Twombly*, *Actavis*, or any other precedent.

"[A]lthough *Twombly* and *Iqbal* require factual amplification where needed to render a claim plausible," this Court has "reject[ed] [the] contention that *Twombly* and *Iqbal* require the pleading of specific evidence or extra facts beyond what is needed to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120-21 (2d Cir. 2010) (internal quotations and citation omitted). Evaluating a claim's plausibility is "a context-specific task" where a plaintiff's allegations are accepted as true, and all inferences are drawn in its favor. *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717-18 (2d Cir. 2013) (cleaned up).

The district court misapplied *Twombly* by demanding additional factual allegations to rebut Defendants' contention that the agreements were lawful.

*Twombly* was a conspiracy case where the plaintiffs alleged only parallel conduct and asked for an inference of an agreement. The Supreme Court held such allegations alone to be insufficient to establish a "meeting of the minds." *Twombly*, 550 U.S. at 557. Plaintiffs' reverse payment allegations are much different. Unlike mere parallel conduct, reverse payments raise a suspicion of anticompetitive conduct warranting discovery.

When a brand plaintiff in a Hatch-Waxman patent lawsuit agrees to pay the generic defendant "many millions of dollars to stay out of its market, even though the defendants did not have any claim that the plaintiff was liable to them for damages," the "form of settlement is unusual" and "there is reason for concern that settlements taking this form tend to have significant adverse effects on competition." *Actavis*, 570 U.S. at 147-48. Such a *quid pro quo* is unlike ambiguous evidence of parallel conduct and does not require additional detail to state a plausible claim.

Nor does *Actavis*'s rejection of the "quick look" rule of reason support a requirement that plaintiffs plead facts to rebut the possibility that defendants might be able to justify the reverse payment. The "quick look" rule of reason differs from the full rule of reason in that it presumes that certain conduct violates the Sherman Act without proof of market power. *See United States v. Apple, Inc.*, 791 F.3d 290, 329-30 (2d Cir. 2015).

29

That requirement does not support the district court's mandate that Plaintiffs plead facts before discovery to eliminate the possibility that Defendants might justify their large payments. The district court asserted that allowing Plaintiffs to proceed without pleading the absence of justification "would do precisely what *Actavis* forbids—place the burden on the defendant to justify any side deal for goods and services entered into at the same time as an agreement to settle litigation." SA-0085. The district court got *Actavis* precisely backwards. Far from forbidding courts from putting the burden on defendants to justify reverse payments, that is squarely where *Actavis* put that burden.

As the Supreme Court explained, the "possibility" that defendants "may have provided for a reverse payment without having sought or brought about the anticompetitive consequences . . . does not justify dismissing the [plaintiff's] complaint." *Actavis*, 570 U.S. at 156. Rather, it is up to the antitrust defendant to try to "show *in the antitrust proceeding* that legitimate justifications are present, thereby explaining the presence of the challenged term and showing the lawfulness of that term under the rule of reason." *Id*. (emphasis added). In *Actavis* itself, the FTC alleged that a brand manufacturer paid cash via side deals in return for an agreed upon entry date, and the Supreme Court held that the allegation was sufficient to survive a motion to dismiss and proceed to discovery. Although the defendants characterized the payments as compensation for other services rather

than to induce the generic manufacturers to delay entry, the Court reversed the dismissal of the FTC's complaint in which it alleged that the services had "little value" and that the "true point of the payments was to compensate the generics" to delay their launch. *Id.* at 145.

This result is consistent with the rule of reason's burden-shifting framework, which requires that the *defendant* offer procompetitive justifications *after* the plaintiff shows that the challenged restraint is anticompetitive. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). Under the rule of reason, defendants' claimed justifications typically cannot be resolved on a motion to dismiss. *Todd*, 275 F.3d at 214 (explaining that ultimate question under the rule of reason of whether conduct is anticompetitive in light of defendants' explanations "is a question of fact that cannot be resolved on this Rule 12(b)(6) motion"); *Davitashvili v. Grubhub Inc.*, 2022 WL 958051, at *6 (S.D.N.Y. Mar. 30, 2022) ("consideration of alleged procompetitive effects of defendants' actions and the ultimate judgment of whether any procompetitive effects 'outweigh' any anticompetitive effects is inappropriate on a motion addressed to the sufficiency of the complaint"); *In re Keurig Green Mt. Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 238-39 (S.D.N.Y. 2019) ("Any procompetitive justification for . . . restrictions is not appropriately weighed on a motion to dismiss.").

Since *Actavis*, lower federal courts have consistently recognized that reverse payment claims are adequately pled without the detail required by the district court here. For example, in *King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.*, 791 F.3d 388 (3d Cir. 2015) ("*Lamictal*"), the Third Circuit reversed the dismissal of a reverse payment complaint where plaintiffs simply pled:

- The brand sought to induce the generic to delay generic entry by agreeing to an "unjustified no-AG [authorized generic] agreement," *i.e.,* an agreement not to launch its own generic in competition with the generic manufacturer;

- The brand agreed not to launch an AG during the generic's 180-day exclusivity period;

- The brand had an incentive to launch an AG;

- The generic had a history of launching at risk (*i.e.*, before resolution of the patent case); and

- The patent at issue was likely to be invalidated in the absence of the settlement.

*Id.* at 409-10.

The Third Circuit held that these allegations sufficiently demonstrated that the brand's promise not to launch an AG was an inducement to the generic competitor to protect the brand's supracompetitive monopoly profits from the risk that the brand's patents would be found invalid or not infringed. *Id.* at 409-10. The court further held that "[i]f genuine issues of material fact remain after

discovery, the rule-of-reason analysis is for the finder of fact, not the court as a matter of law." *Id*. at 411.

Similarly, in *In re Lipitor Antitrust Litigation*, 868 F.3d 231 (3d Cir. 2017), the Third Circuit reversed dismissal of a reverse payment complaint where the plaintiffs alleged that:

- The generic (Ranbaxy) faced a claim of hundreds of millions of dollars in damages by the brand company (Pfizer) as a result of having launched a generic version of another drug (Accupril) at risk;

- Despite Pfizer's high likelihood of success as to Accupril, Pfizer released its Accupril claim in exchange for Ranbaxy's payment of just $1 million;

- The release of the Accupril claims was unjustified, as its value "far exceeded" any of Pfizer's saved litigation costs or any services provided by Ranbaxy; and

- Pfizer's release of the Accupril claims was an inducement to protect its Lipitor monopoly profits based on the Lipitor patent which was at risk of being found invalid or not infringed.

*Id.* at 253.

The court held that the plaintiffs sufficiently alleged a large reverse payment. *Id.* at 255. The court also concluded that the payment was unjustified because "all that need be alleged" is that litigation costs avoided by Pfizer in settling "fail to explain" the value conferred by Pfizer. *Id.* at 256. Critically, the Third Circuit rejected any requirement that plaintiffs rebut potential justifications in their complaint:

*Actavis* does not require antitrust plaintiffs to come up with possible explanations for the reverse payment and then rebut those explanations in response to a motion to dismiss. The Supreme Court clearly placed the onus of explaining or justifying a large reverse payment on *antitrust defendants*. In examining allegations of a reverse payment at the pleading stage, the Supreme Court acknowledged that, even if there is an explanation for a reverse payment, "that possibility d[id] not justify dismissing the [antitrust plaintiff's] complaint. *An antitrust defendant* may show in the antitrust proceeding that legitimate justifications are present, thereby explaining the presence of the challenged term and showing the lawfulness of that term under the rule of reason."

*Id.* at 256-57 (quoting *Actavis*) (emphasis in original). *See also id.* at 255

(recognizing that the FTC's complaint in *Actavis* "did not preemptively negate

justifications for the reverse payments").

In the same opinion, the Third Circuit held that another reverse payment

involving the drug Effexor was adequately pled. There, the plaintiffs alleged that:

- As part of a Hatch-Waxman patent settlement, the brand agreed not to compete with the generic by selling an authorized generic of either Effexor XR or Effexor IR;

- The "no-AG agreement allegedly 'constituted a substantial, net payment by Wyeth to Teva in exchange for Teva agreeing to delay generic entry much later than it otherwise would have'"; and

- In return for the alleged payments, "Teva agreed it would delay entry into the Effexor XR market by not selling its generic version of the drug until a specified date" which meant that "U.S. drug purchasers paid *billions of dollars* more for extended-release venlafaxine than they otherwise would have absent the Wyeth-Teva agreement."

*Id.* at 258 (emphasis in original).

The Third Circuit rejected the district court's reasoning that plaintiffs'
estimate of the no-AG agreement's value was insufficient because (1) it was based
on "general assumptions," (2) plaintiffs failed to allege that Wyeth would have
sold an authorized generic absent the settlement, and (3) the payment was
explained by settlement agreement terms that required Teva to pay royalties. *Id.* at
259. The Third Circuit held that such arguments "ask too much" of the plaintiffs at
the pleading stage, and that any proffered justification would "require factual
assessments, economic calculations, and expert analysis that are inappropriate at
the pleading stage." *Id.* at 259, 261. Ultimately, the Third Circuit held that
plaintiffs' allegations "sufficiently allege a reverse payment settlement agreement
as laid out by the Supreme Court in *Actavis*." *Id.* at 259. *See also FTC v. AbbVie,
Inc.*, 976 F.3d 327, 356 (3d Cir. 2020) ("A plaintiff can meet th[e] pleading
standard [under *Actavis*] without . . . calculating reliably the payment's exact size,
or preempting every possible explanation for it"), *cert. denied*, 141 S. Ct. 2838
(2021).

Numerous lower courts, including district courts in this Circuit, have
similarly rejected the district court's requirement that plaintiffs rebut at the
pleading stage justifications that defendants might offer at trial. *See, e.g.*,
*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*, 2016 WL
4992690, at *14 (S.D.N.Y. Sept. 13, 2016) (holding justifications to be

"intrinsically fact-based determinations [that] cannot be made on a pre-answer motion to dismiss"); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2015 WL 5458570, at *7 (D. Mass. Sept. 16, 2015) (concluding that burden of proving justification under the rule of reason "as with any affirmative defense, cannot be resolved on a motion to dismiss unless the facts establishing the defense are clear on the face of the plaintiffs' complaint"); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 244 (D. Conn. 2015) ("precise and particularized estimates of fair value and anticipated litigation costs may require evidence in the exclusive possession of the defendants . . . and . . . are sufficiently factual to require discovery"); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 753 (E.D. Pa. 2014) (concluding that *Twombly* "does not require an antitrust plaintiff to plead facts that, if true, definitively rule out all possible innocent explanations"); *United Food & Com. Workers Local 1776 & Participating Emps. Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1072 (N.D. Cal. 2014) (recognizing defendants' burden to justify reverse payment could not be established on motion to dismiss). *See also In re Cipro Cases I & II*, 348 P.3d 845, 871 (Cal. 2015) (holding that plaintiffs must rebut justifications for a reverse payment only after defendants come forward with such justifications).

The decision here is not a "middle course" as the district court suggested. SA-0081. It is an outlier that misapplies and contravenes both *Twombly* and

*Actavis*.  Allegations of large payments by a brand to a competitor to settle patent

litigation – as Plaintiffs make here – are sufficient to state a plausible antitrust

claim.

### III.  PLAINTIFFS STATED A PLAUSIBLE CLAIM BY ALLEGING THAT FOREST PAID ITS SIX GENERIC COMPETITORS TO INDUCE THEM TO DELAY GENERIC ENTRY.

Plaintiffs' complaints complied with the pleading standards of *Twombly*,

*Actavis*, and the lower federal courts.  Plaintiffs alleged:

- In return for the agreement of each Generic Defendant not to sell generic Bystolic until September 17, 2021, seven years after settling, Forest entered a "side-deal" with each as a *quid pro quo* for the promised delay. JA-1476-77.

- Forest publicly admitted that each side deal was related to the settlement agreements with its six generic competitors.  JA-1480.

- Each side deal included payments ranging from $15 million to $37.5 million, which were all large compared to the legal expenses of less than $6 million for each lawsuit that Forest avoided by settling. JA-1528-50.

- The side deals could not be explained by Forest's saved legal costs since other payments in the settlement agreements were identified as saved legal costs.  JA-1482.

- Forest could not have prevailed on the '040 Patent and kept generic Bystolic off the market until September 17, 2021, because the narrow patent was not infringed and/or was invalid as anticipated or obvious in light of prior art.  JA-1517-24.

After the first dismissal order, Plaintiffs amended their complaints to further

allege that:

- Outside of patent settlements, brand and generic pharmaceutical manufacturers rarely enter into the kind of side deals that Forest entered into with each Generic Defendant.  JA-1526-27.

- Forest has a history of making reverse payment side deals to settle patent litigation with its generic competitors.  JA-1528.

- Forest did not need to pay as much to the Generic Defendants as brand defendants do in other reverse payment cases because the Generic Defendants' shared first-to-file exclusivity meant that each stood to make relatively little from generic Bystolic if they all launched simultaneously. JA-1520.

- Forest had to induce each Generic Defendant to delay its expected entry because none was willing to forfeit its exclusivity, and each insisted on so-called "contingent launch" provisions that accelerated each generic's launch date to the date that any other generic manufacturer launched.  *Id*.

These allegations far exceed those in other reverse payment cases.  They give rise to a fair inference that Forest paid off all six generic competitors to preserve its monopoly power over Bystolic.  There is no ambiguity in these allegations that would prevent Defendants from defending themselves.  Forest itself disclosed that the side deals were related to its settlement agreements and suggested that the side deals were each worth more than $15 million.

Instead of affording Plaintiffs the full benefit of the fair inferences from their allegations, the district court improperly compartmentalized Plaintiffs' allegations.  *Cf. Cont'l Ore Co. v. Union Carbide Corp.*, 370 U.S. 690, 699 (1962) ("plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each").

The Supreme Court explained that the "likelihood of a reverse payment bringing about anticompetitive effects depends upon its size, its scale in relation to the payor's anticipated future litigation costs, its independence from other services for which it might represent payment, and the lack of any other convincing justification." *Actavis*, 570 U.S. at 159. These are not discrete requirements. The Court defined the size or scale of the payment in relation to the brand's anticipated litigation expenses, *id.*, which it also discusses as a potential "justification" for the payment, *id.* at 156. Thus, lower courts have discussed many of the same factors in connection with the payment's size and possible justification. *See, e.g.*, *Lamictal*, 791 F.3d at 412 (rejecting district court's conclusion that "consideration . . . reasonably related to the removal of the uncertainty" was "justified" because the proper scope of "justifications" under *Actavis* "might include 'litigation expenses saved through the settlement' or 'compensation for other services that the generic has promised to perform'") (citations omitted); *In re Loestrin 24 Fe Antitrust Litig.*, 261 F. Supp. 3d 307, 331 (D.R.I. 2017) (finding that, on a 12(b)(6) motion, "the Court takes a broad and holistic look at the deal to determine whether the entire deal, taken as a whole, amounted to a large and unjustified reverse payment" according to the factors laid out in *Actavis*); *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, 88 F. Supp. 3d 402, 415 (E.D. Pa. 2015) ("*Provigil*") (stating that *Actavis* holds that "a large payment can provide strong evidence of the

relevant anticompetitive harm," and thus "evidence of a large payment is required for a plaintiff to satisfy its initial burden" under the rule of reason).

Despite acknowledging that the concepts of "large" and "unjustified" were related (SA-0021), the district court required distinct allegations that each of Forest's payments to its generic competitors was large *and* unexplained. But this is contrary to *Actavis*'s teaching. Courts on motions to dismiss have focused on the presence of large payments made to induce the generic to settle because *Actavis* puts the burden on the defendant to justify any payment during the litigation. *See supra* pp. 32-37.

The district court similarly compartmentalized each of Forest's six reverse payments, reasoning that it "does not follow that simply because a reverse-payment agreement with one Generic Defendant is anticompetitive, the brand manufacturer's agreements with every other generic defendant is anticompetitive." SA-0034. But as Plaintiffs alleged, all six Generic Defendants shared first-filer exclusivity. JA-1519-20. As a result, Forest could only preserve its monopoly by paying off all of them. In addition, each Generic Defendant insisted on, and received, a so-called contingent launch provision that permitted an early launch if any other generic launched before September 17, 2021. In this context, the payments were related, and the district court should not have viewed each in isolation.

In addition, as research has demonstrated, brand and generic manufacturers rarely enter business transactions outside of patent litigation settlements. JA-1526-27. Forest's entry into side deals with each of its potential generic competitors to its blockbuster Bystolic product further supports the plausibility of Plaintiffs' claims.

The district court dismissed Plaintiffs' allegation that Forest made similar reverse payments to protect its monopoly over Namenda, another blockbuster product. SA-0084-85. Regardless of its admissibility at trial, the fact that Forest was alleged to have engaged in the same conduct at other times increases the plausibility of Plaintiffs' claims and warrants permitting them the opportunity to take discovery to prove them. *Lynch v. City of New York*, 952 F.3d 67, 82 (2d Cir. 2020) ("Admissibility, however, is an issue for trial or summary judgment; in order to state a claim that is sufficiently plausible to avoid dismissal at the pleading stage, the fact asserted need not be presented in a form that would be admissible at trial.").

Finally, the district court ignored the fair inferences from Plaintiffs' allegations that Forest's patent rights would not have prevented the launch of generic Bystolic. *Actavis* specifically provides that plaintiffs do not need to show that the Generic Defendants would have prevailed in the patent litigation to establish a reverse payment violation. *Actavis*, 570 U.S. at 157 (it is "not

necessary to litigate patent validity to answer the antitrust question"). However, Plaintiffs' allegations that Forest could not have prevailed in the patent litigation further supports the plausibility of Plaintiffs' claims. The agreement by all six of Forest's generic competitors not to introduce generic Bystolic until September 17, 2021, unless another generic manufacturer entered earlier, when Forest's patent was unlikely to prevent them from entering until that date, is a powerful allegation that suggests that the Generic Defendants received something to convince them to abandon their strong patent challenges.

## IV.  THE DISTRICT COURT IMPROPERLY WEIGHED THE INFERENCES FROM PLAINTIFFS' ALLEGATIONS.

The district court also erred in weighing the plausibility of the inferences that Plaintiffs sought to draw from their allegations against the competing inferences advanced by the Defendants. As *Anderson News* expressly held, at the pleading stage, "the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment." *Anderson News*, 680 F.3d at 184. And, "[t]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Id.* at 185.

Plaintiffs repeatedly cited *Anderson News* in their briefs and argument on Defendants' motion to dismiss. *See* S.D.N.Y. Dkt. No. 20-cv-5735, ECF No. 409, at 3, 39; S.D.N.Y. Dkt. No. 20-cv-5735, ECF No. 285 at 15, 31; JA-2018-21. But the district court did not cite it in either of its opinions and violated its teaching at every turn. It weighed the competing inferences with respect to each reverse payment that Plaintiffs alleged and found the Defendants' inferences to be more persuasive. *See supra* p. 25 (describing the district court's conclusions that inferences favoring defendants were "more plausible," "equally as plausible," or "equally explicable").

## A.    Hetero

Following the first dismissal order, Plaintiffs alleged detailed support for their allegation that Forest did not need the Hetero Supply Agreement. *See supra* pp. 12-14. A fair inference from these allegations is that Forest offered it to compensate Hetero for agreeing to delay generic entry. None of the district court's reasons for rejecting this inference is appropriate on a motion to dismiss.

First, the district court improperly rejected Plaintiffs' allegations that Forest had no need for the Supply Agreement because it already had sufficient supply from Janssen, one of its longstanding suppliers. It concluded that the Janssen supply agreement "could be entirely consistent with the opposite conclusion that . . . Forest was in great need of another supplier." SA-0086. But *Anderson News*

forbids such a determination: "A court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the events *merely because the court finds a different version more plausible*." *Anderson News*, 680 F.3d at 185 (emphasis added).

Second, the district court improperly rejected Plaintiffs' allegation that Forest awarded the supply agreement to Hetero without competitive bidding because Plaintiffs failed to specifically allege that a bid selection process would be required. SA-0088-89. But the natural inference from Plaintiffs' allegations is that competitive bidding for supply agreements is typical, and that Forest's failure to engage in competitive bidding suggests that its real interest was in compensating Hetero, not obtaining additional API. Contrary to the district court's claim (SA-0088), there was nothing circular about Plaintiffs' allegations. The district court's conclusion that "[t]he more plausible inference is that with a product as specialized as API, there would be no need or opportunity for competitive bidding" (SA-0089) is exactly the kind of choice between competing inferences that *Anderson News* prohibits.

Third, the district court concluded from its own reading of the "plain terms" of the Janssen supply agreement and the Hetero term sheet that the term sheet "could not have been a financial windfall to Hetero." SA-0090. It reasoned that Hetero's price must have been at least 15% cheaper than Janssen's price because

44

the Janssen supply agreement permitted termination only if Forest provided evidence of an offer for API supply that was 15% lower than Janssen's price. *Id.* But the Hetero term sheet did not provide that it would be effective only if Forest had the contractual right to terminate its Janssen supply agreement. The term sheet stated that Forest would "use good faith efforts to amend its current supply agreement with Janssen." *Id.* If the Janssen agreement granted Forest the right to terminate, Forest would not have needed to amend it. In addition, neither the Hetero term sheet nor the Janssen supply agreement provides any evidence of the prices charged. The district court's inference that Hetero offered a lower price than Janssen assumes facts that were neither pled nor proven.

Regardless, it is Defendants' burden to prove that a payment was made for fair value. *Actavis*, 570 U.S. at 156. Even if Defendants could satisfy that burden at this stage by showing that Hetero offered Forest a competitive fair value rate for API, it would not warrant dismissal of Plaintiffs' claims. "Nowhere in *Actavis* does the Supreme Court suggest that fair market value is a silver bullet against antitrust scrutiny." *In re Nexium (Esomeprazole) Antitrust Litig.*, 42 F. Supp. 3d 231, 263-64 (D. Mass. 2014), *aff'd*, 842 F.3d 34 (1st Cir. 2016). *See also Provigil*, 88 F. Supp. 3d at 419 (same). A payment for fair value might still represent an improper *quid pro quo* for an *agreement* to delay generic entry if the evidence shows that the purpose of the payment was to induce the generic manufacturer to

delay its entry.  *See Actavis*, 570 U.S. at 158 (identifying the reason for a payment as the "relevant antitrust question").

Finally, the district court rejected Plaintiffs' allegations that the Hetero term sheet was a "rush job" and that Forest had a long-standing relationship with Janssen to provide API.  SA-0091-92.  It reasoned that the term sheet's terseness was "equally consistent with the conclusion that it was a preliminary agreement for subsequent negotiations" as with a conclusion that Forest used it to pay off Hetero.  SA-0091.  Similarly, it asserted that the long-standing relationship between Forest and Janssen "could be entirely consistent" with Forest needing a backup supplier.  SA-0092.  But, it is not Plaintiffs' obligation to rule out all alternative explanations on a motion to dismiss.  The Supreme Court and this Court have required courts to draw all inferences in favor of the plaintiffs.  *See supra* pp. 26-27.

## B.    Torrent

Following the first dismissal order, Plaintiffs alleged detailed support for their allegation that Forest did not need the patents covered by the Torrent assignment agreement.  *See supra* pp. 14-15.  Again, the district court improperly rejected Plaintiffs' allegations.

First, it reasoned that Plaintiffs' allegations were insufficient because they would render every patent assignment agreement by a brand manufacturer "presumptively suspect and anticompetitive, thereby undermining *Actavis*."  SA-

0094.  But recognizing the plausibility of a reverse payment claim based on a patent assignment agreement does not make every patent assignment agreement presumptively suspect any more than recognizing the plausibility of a reverse payment claim based on a cash reverse payment makes cash payments in other contexts presumptively suspect.  *See also Lamictal*, 791 F.3d at 406-07 ("[T]he fact that the Patent Act expressly authorizes licensing does not necessarily mean it also authorizes reverse payments to prevent generic competition.").  *Actavis* recognized that a brand's payment made in a settlement to a generic was an "unusual" situation warranting further proceedings even where the defendant claimed the payment could be explained.  570 U.S. at 147.

Second, the district court pointed to evidence in *Provigil* as the kind of evidence that should be pled.  But *Provigil*, 88 F. Supp. 3d at 405, was a summary judgment opinion based on a full discovery record.  It did not establish the standard for evaluating the sufficiency of allegations in a complaint.  The Third Circuit recognized that a standard such as that adopted by the district court "would impose a nearly insurmountable bar for plaintiffs at the pleading stage" by requiring them to have "evidence in the exclusive possession of the defendants, as well as expert analysis."  *Lipitor*, 868 F.3d at 257 (citation omitted).

Third, the district court improperly rejected the plausible inference that the Patent Assignment was made to delay generic Bystolic and instead adopted its own

preferred inference that the assignment was "consistent with and equally explicable by a pro-competitive justification." SA-0095 (quoting S.D.N.Y. Dkt. No. 20-cv-5735, ECF No. 354 at 27). It rejected Plaintiffs' allegation that the Patent Assignment was not justified as necessary to protect Bystolic as "implausible," even though it concluded that the Patent Assignment *did not* protect Bystolic but was meant to permit the development of a new form of Bystolic. *See* SA-0095-96. Had the district court drawn all inferences in Plaintiffs' favor, as it was required to do, it should have accepted Plaintiffs' allegation that the Patent Assignment was not justified as protection for Bystolic.

Fourth, the district court rejected Plaintiffs' allegation that the Patent Assignment had "little or no value to Forest" because the $7 million milestone in the Torrent agreement was triggered by issuance of any of the ten assigned patents rather than a patent that would have supported a particular reformulation. SA-0093. Despite the similarity of this allegation to the FTC's assertion in *Actavis* that the co-promote agreements had "little value," *Actavis*, 570 U.S. at 145, the district court rejected it because Plaintiffs failed to "plead any metric to determine whether that payment was excessive, nor do they plead anything showing that the payments were valueless or not useful." SA-0097. Such allegations are not necessary to plausibly allege that a payment was made as a *quid pro quo* for delayed generic entry; nor can they be demanded of a plaintiff before discovery. The district court

concluded that "Forest placed a premium on a future grant of that patent, or an application derived from the other listed patents, in the United States, as such issuance would be essential to actualizing the value of the patents." *Id.* This conclusion is not supported by anything in Plaintiffs' complaints. It is the kind of conclusion that a jury might (or might not) make after hearing all of the evidence, not a judgment that a court should make on a motion to dismiss.

Finally, the district court rejected Plaintiffs' allegations that there was no public disclosure that Forest was seeking to develop a new form of Bystolic because a "more plausible inference is that the agreement was simply not material for SEC reporting purposes." SA-0098. Again, under *Anderson News*, a district court must not assess what inferences are "more plausible."

## C. Alkem

Following the first dismissal order, Plaintiffs alleged detailed support for their allegation that Forest did not need Alkem to manufacture Bystolic or Byvalson. *See supra* pp. 15-16.

The district court again improperly evaluated and rejected Plaintiffs' allegations. It asserted without any support that a "plaintiff must allege that there is something about that agreement other than its timing and the fact that it results in the generic manufacturer honoring a patent that supports the inference that it is anticompetitive." SA-0098 (quoting S.D.N.Y. Dkt. No. 20-cv-5735, ECF No. 354

at 49). But the exchange of value in return for honoring a patent is *precisely* what *Actavis* identifies as the danger of reverse payments. *Actavis*, 570 U.S. at 147-48 (recognizing payment in exchange for agreement to stay out of market was "unusual" and "tend[s] to have significant adverse effects on competition").

The district court assessed the free goods and pricing terms of the agreement and determined that they were reasonable and did not support a "plausible inference of anticompetitive conduct." SA-0098-99. In reaching this conclusion, it failed to consider Plaintiffs' allegations that Forest did not need the agreement or that it was offered to delay generic Bystolic. JA-1535-36.

It further rejected Plaintiffs' allegation that the Term Sheet's provision for reimbursement of development expenses was duplicative of its milestone payments made for development work. JA-1536. Contrary to Plaintiffs' allegations, it decided that there was no duplication because the "expenses constitute reimbursements; the milestones constitute rewards for achievements." SA-0100.

It rejected Plaintiffs' allegations that the agreement was "rushed" because the "opportune time for parties who were once adversaries to reach an agreement for products and services is when they are settling litigation." SA-0101. But again, this kind of exchange during settlement is what *Actavis* found suspicious. It is not a reason to dismiss.

The district court rejected Plaintiffs' allegations that Forest did not comply with "typical industry practice" of conducting due diligence *before* entering into a binding agreement because the Term Sheet provided for due diligence *after* its execution. SA-0100-101. But the district court's preferred explanation ignores the implication from the failure to comply with industry practice: this agreement was not intended to obtain the benefits of the agreement, but rather was intended to confer a payment to avoid the risk of generic Bystolic competition.

Finally, the district court rejected Plaintiffs' allegations that no public source revealed that Forest had any interest in Alkem to manufacture Bystolic or Byvalson. SA-0102. The court asserted that the "absence of evidence is not evidence" and that a "far more likely inference" from Plaintiffs' allegations is that before reaching an agreement, there was no need for Forest's interest in Alkem to be disclosed. SA-0102-03. But plausibility does not require certainty, especially "where the facts are peculiarly within the possession and control of the defendant." *Arista Records*, 604 F.3d at 120. Nor should the district court have substituted its own view of what it believes to be more likely on a motion to dismiss.

### D.     Glenmark

Following the first dismissal order, Plaintiffs alleged detailed support for their allegation that Forest did not act like it had an interest in developing mPGES-1 with Glenmark. *See supra* pp. 17-18.

Instead of accepting Plaintiffs' allegations, the district court concluded that "the Collaboration and Option Agreement provided substantial value to Forest." SA-0105. The district court claimed the Collaboration Agreement "gave Forest a seat at the table," and pointed to Forest's right to participate on committees to develop mPGES-1. *Id.* But, as Plaintiffs alleged, these rights only had value to Forest if it negotiated a final joint venture agreement. JA-1539-40. Absent such a final agreement, the only benefit that the Collaboration Agreement provided to Forest was a right to negotiate. The Collaboration Agreement itself valued that right to negotiate at $6 million. *Id.* Thus, this best case for Defendants still leaves $9 million completely unexplained as anything other than a reverse payment.

The Court also refused to draw any inference in Plaintiffs' favor from the difference in detail between the Collaboration Agreement for mPGES-1 and a 2004 collaboration agreement between Forest and Glenmark. Plaintiffs asserted that the difference between the agreements suggested that Forest did not have the same interest in the mPGES-1 collaboration as it did in the prior collaboration that was not part of a Hatch-Waxman settlement. Instead of drawing the inference favoring Plaintiffs, the district court concluded that Forest and Glenmark's prior transaction "*tends* to undermine Plaintiffs' claim rather than support it." SA-0108 (emphasis added). Once again, the district court demonstrated its improper inclination to pick the inference that it believed to be most plausible.

### E. Amerigen

Following the first dismissal order, Plaintiffs alleged detailed support for

their allegation that Forest did not have a need for Amerigen's generic products

covered by the Term Sheet Collaboration agreement. *See supra* pp. 18-19.

As with the other side deals, the district court rejected inferences that

favored Plaintiffs and adopted contrary inferences that it found more plausible.  In

response to Plaintiffs' allegation that no public information showed that Forest and

Amerigen had a preexisting relationship or that Forest had an interest in

Amerigen's product, it held that the absence of information does not allow one to

infer that Forest lacked any such interest.  SA-0109.  And, it asserted that the fact

that Forest had not previously purchased rights from Amerigen for a generic

product "does not give rise to a plausible inference that Forest's agreement was

anticompetitive."  SA-0110.  But an exchange of a side deal for Amerigen's

agreement to delay generic Bystolic would likely be anticompetitive under *Actavis*.

The district court's conclusion that a "more plausible inference" is that the

agreement was intended to transfer royalties in exchange for product development,

*id.*, improperly chooses between alternative inferences. *See supra* p. 27.

The district court further rejected Plaintiffs' allegation that Forest "did not

truly care about whether [Amerigen's] products fit within its corporate focus"

because Amerigen had the unilateral right to substitute alternative products.  SA-

53

0110 (quoting S.D.N.Y. Dkt. No. 20-cv-5735, ECF No. 427 ¶ 197). According to the district court, that right did not make the agreement "pretextual." *Id.* Yet, it clearly supports an inference that Forest was not concerned with the identity of the products in the agreement. Amerigen's agreement to consider Forest's comments on any discontinuation and propose alternative products with "similar value" does not mandate a conclusion that the agreement's terms allowed "Forest to *maintain* its corporate focus and the value of the agreement by giving it the option to choose its follow-up products and by ensuring that those products were viable." SA-0010-11 (emphasis in original).

Similarly, the district court rejected Plaintiffs' allegations that a brand company like Forest would not ordinarily be interested in licensing generic products like Amerigen's. It claimed that Plaintiffs offered no reason why a company that sells branded products would not want to diversify its product portfolio to also offer generic products. SA-0111. But Forest's 10-K shows that the brand and generic business have very different business models. As Forest's 10-K explained, "to remain competitive, we must continue to develop and launch new pharmaceutical products." JA-1159, JA-1171. While a brand company makes money from developing or licensing new drugs, generic companies make their money, not by developing new therapies, but by being the first to introduce new generic versions of existing products. JA-1504-05. The district court's

conclusion that as a matter of law, it would be a "'rational and competitive business strategy'" for Forest "not to close itself off" from an opportunity to invest in a generic (SA-0112) is contrary to Plaintiffs' allegations and an issue for proof after full discovery.

Finally, Plaintiffs alleged that Forest and Amerigen's execution of a final agreement after Forest received a Civil Investigative Demand from the FTC suggested that they were trying to paper over the reverse payment. JA-1542. The district court rejected this inference, asserting that the timing of the final agreement "is equally consistent with the inference that Forest and Amerigen were executing their obligations under the Term Sheet." SA-0112. It was improper for the district court to reject Plaintiffs' allegations. Forest and Amerigen's failure to make any effort to finalize their agreement until the FTC started questioning their conduct plainly suggests that the final agreement was an attempt to make the transaction look more like a legitimate deal as opposed to a payment for delay.

### F.    Watson

Forest's final Bystolic settlement was with Watson. Unlike the first five agreements, the district court held that Plaintiffs had not adequately pled that Forest made a large payment to Watson. SA-0113-14. Following the first dismissal order, Plaintiffs alleged detailed support for their allegation that the

Letter and Termination Agreements concerning the Brazilian pharmaceutical manufacturer Moksha8 constituted a payment to Watson. *See supra* pp. 19-21.

The district court held that Plaintiffs did not plead any facts from which a factfinder could infer that the agreements were "for other than fair value." SA-0114. But under *Actavis*, 570 U.S. at 156, it is Defendants' burden to prove fair value in the antitrust proceeding.

Moreover, the district court's assertion that Plaintiffs pled no facts to infer that value was transferred to Watson (SA-0113) is wrong. Plaintiffs pled that Forest identified the Letter and Termination Agreements as a side deal related to Forest's settlement of the Bystolic litigation with Watson. *See supra* p. 21. They further alleged that the Letter and Termination Agreements were worth more than $15 million to Watson because Forest disclosed them in its Merger Agreement. The criteria for disclosure required the identification of material contracts defined to include "any Contract involving the settlement of any action or threatened action (or series of related actions) (A) which will (x) involve payments after the date hereof of consideration in excess of $15,000,000 or (y) impose monitoring or reporting obligations to any other Person outside the ordinary course of business or (B) with respect to which material conditions precedent to the settlement have not been satisfied." JA-1548. Plaintiffs pled that the Letter and Termination Agreements were disclosed because they had a value of over $15 million and not

because of the other two materiality requirements. JA-1548. The Letter and Termination Agreements did not identify any monitoring or reporting obligations to any person outside the ordinary course of business nor specify unsatisfied material conditions precedent to the settlement. *Id.* Rather than giving Plaintiffs the benefit of their allegations, the district court found that the inference that the Agreements were disclosed for one of the other reasons was "equally as plausible as the inference that there was a payment in excess of $15 million." SA-0116.

The district court also rejected Plaintiffs' allegation that as the last to settle Watson had considerable leverage, concluding that there is "always a last one to settle," and that each reverse payment must be considered separately. SA-0116. But this approach (1) failed to give Plaintiffs the benefit of their allegations, (2) improperly compartmentalized Plaintiffs' allegations, and (3) ignored the context of the reverse payments in this case. That Forest entered side deals conferring large payments on five of the six first-filers suggests that Forest was incentivized to make a large payment to the last to settle (Watson), since if Watson did not settle and instead launched, Forest's payments to delay the first five generics would be effectively nullified by virtue of the contingent launch provisions that would allow the first five to launch when Watson did. Nor did the district court credit allegations that the '040 Patent was not sufficiently strong to keep the Generic Defendants off the market until the patent expired.

Finally, the district court faulted Plaintiffs for failing to plead exactly how value was transferred from Moksha8 to Watson in the three-party transaction between Forest, Watson, and Moksha8.  But Plaintiffs do not have all the documents referred to in the Letter and Termination Agreements.  JA-1548.  Based on the information that they had, they alleged that Forest's disclosure of the Termination Agreement provides a strong inference that Forest transferred value to Watson through the release Watson received from potential claims.  JA-1546-46.  Plaintiffs should not be required to plead additional facts that are "peculiarly within the possession and control of the defendant," *Arista Records*, 604 F.3d at 120, especially when the facts available suggest that there was a transfer of over $15 million in some way from Forest to Watson.

## CONCLUSION

For the foregoing reasons, this Court should reverse the orders of the district court granting Defendants' motions to dismiss and remand for further proceedings in the district court.

Dated:    June 12, 2023
Refiled:  June 14, 2023

                                   Respectfully submitted,

/s/ Bruce E. Gerstein

Bruce E. Gerstein
Kimberly M. Hennings
GARWIN GERSTEIN & FISHER LLP
88 Pine Street, 10th Floor
New York, New York 10005
212-398-0055

*Interim Co-Lead Counsel for Plaintiffs-*
  *Appellants the Direct Purchaser*
  *Class and Counsel for Plaintiff-*
  *Appellant Smith Drug Company*

/s/ Barry L. Refsin

Barry L. Refsin
Alexander J. Egerváry
Caitlin V. McHugh
HANGLEY ARONCHICK SEGAL
  PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, Pennsylvania 19103
215-568-6200

*Counsel for Plaintiffs-Appellants*
  *CVS Pharmacy Inc., Rite Aid*
  *Corporation, and Rite Aid Hdqtrs.*
  *Corp.*

David F. Sorensen
Caitlin G. Coslett
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
215-873-3000

*Interim Co-Lead Counsel for Plaintiffs-*
  *Appellants the Direct Purchaser*
  *Class and Counsel for Plaintiff-*
  *Appellant Smith Drug Company*

Eric L. Bloom
HANGLEY ARONCHICK SEGAL
  PUDLIN & SCHILLER
2805 Old Post Road, Suite 100
Harrisburg, Pennsylvania 17110
717-364-1030

*Counsel for Plaintiffs-Appellants*
  *CVS Pharmacy Inc., Rite Aid*
  *Corporation, and Rite Aid Hdqtrs.*
  *Corp.*

/s/ Sharon K. Robertson

Sharon K. Robertson
Donna M. Evans
COHEN MILSTEIN SELLERS & TOLL
  PLLC
88 Pine Street, 14th Floor
New York, New York 10005
212-838-7797

/s/ Robin A. van der Meulen

Robin A. van der Meulen
Matthew J. Perez
DICELLO LEVITT LLP
485 Lexington Avenue, Suite 1001
New York, New York 10017
646-933-1000

*Interim Co-Lead Counsel for the
Proposed End-Payor Class and
Counsel for Plaintiffs-Appellants
Mayor and City Council of
Baltimore; UFCW Local 1500
Welfare Fund; Teamsters Western
Region & Local 177 Health Care
Plan; Fraternal Order of Police,
Miami Lodge 20, Insurance Trust
Fund; Law Enforcement Health
Benefits, Inc.; Teamsters Local No.
1150 Prescription Drug Benefit Plan;
and Teamsters Local 237 Welfare
Fund and Teamsters Local 237
Retirees' Benefit Fund*

/s/ Scott E. Perwin

Scott E. Perwin
Lauren C. Ravkind
Anna T. Neill
KENNY NACHWALTER, P.A.
Four Seasons Tower
1411 Brickell Avenue, Suite 1100
Miami, Florida 33131
305-373-1000

*Counsel for Plaintiffs-Appellants
Walgreen Co., The Kroger Co.,
Albertsons Companies, Inc., and
H-E-B, L.P.*

/s/ Michael L. Roberts

Michael L. Roberts
ROBERTS LAW FIRM US, PC
20 Rahling Circle
Little Rock, AR 72223
501-821-5575

Dianne M. Nast
NASTLAW LLC
1101 Market Street, Suite 2801
Philadelphia, PA 19107
215-923-9300

*Additional Counsel for Plaintiffs-
Appellants the Direct Purchaser
Class and Counsel for Plaintiff-
Appellant KPH Healthcare Services,
Inc. a/k/a Kinney Drugs, Inc.*

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), as modified by Local Rule 32.1(a)(4)(A), in that the brief, according to the word-count feature of Microsoft Word 2016, contains 13,297 words.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

/s/ Barry L. Refsin
Barry L. Refsin

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 12, 2023, I served a copy of the foregoing brief on all parties by filing it on the Court's CM/ECF system where it is available for viewing and downloading.  I further certify that on June 14, 2023, I filed a corrected copy of this brief on the Court's CM/ECF system to address issues identified by the Notice of Defective Filing dated June 13, 2023.  The only changes in the corrected brief were to the caption and signature pages.

<u>/s/ Barry L. Refsin</u>
Barry L. Refsin